UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER LYNN HUFF,

                            Case No. No. 18-11159

        Plaintiff,                District Judge Thomas L. Ludington

v.                                Magistrate Judge R. Steven Whalen

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Jennifer Lynn Huff ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #23] be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED [Docket #22].

## I.  PROCEDURAL HISTORY

On November 4, 2014, Plaintiff filed an application for DIB, alleging disability as of December 8, 2013 (Tr. 151). Upon initial denial of the claim, Plaintiff requested an administrative hearing, held on January 11, 2017 in Mt. Pleasant, Michigan (Tr. 46).

Administrative Law Judge ("ALJ") Sean McKee presided.  Plaintiff, represented by attorney John Tsiros, testified, as did Plaintiff's husband, Thomas Huff, and Vocational Expert ("VE") Adolph Cwik (Tr. 56-73, 73-74, 75-83).   On February 2, 2017, ALJ McKee determined that Plaintiff was capable of a significant range of unskilled, exertionally light work (Tr. 30-40).   On March 3, 2018, the Appeals Council declined to review the administrative decision (Tr. 1-6).  Plaintiff filed suit in this Court on March 11, 2018.

## II.  BACKGROUND FACTS

Plaintiff, born January 20, 1977, was 40 at the time of the administrative decision (Tr. 40, 151).  She graduated from high school and worked previously as a baker, cashier, cashier/stocker, mailroom employee, and stocker (Tr. 174).  She alleges disability as a result of arthritis and injuries to the back and bilateral knees (Tr. 173).

### A.  Testimony by Plaintiff and Her Husband

### 1.  Plaintiff

*Plaintiff's counsel prefaced his client's testimony by noting that his client also experienced limitations due to asthma and plantar fasciitis (Tr. 56).  He added that the prescribed medications of Cymbalta and Trazadone were prescribed for pain and restful sleep and that "depression really play[ed] no part" in the case for benefits (Tr. 56).*

Plaintiff then offered the following testimony:

She lived in Bay City, Michigan (Tr. 57).  She did needlework and made wreaths when she was able (Tr. 58).  She had two sons, 17 and 19 (Tr. 58).  Over the past few years

before the hearing, she underwent a total of three athroscopic surgeries on each knee (Tr. 59). She was able to return to work after the surgeries (Tr. 59). Following the surgeries she underwent Synvisc injections (Tr. 59). She had been told by her doctor in 2016 that both knees were "bone-on-bone" and that she required a total knee replacement on both knees (Tr. 60). Both she and her doctor preferred to wait as long as possible to undergo the replacement surgery, noting that a knee replacement typically lasted only 20 years (Tr. 60).

As to Plaintiff's back condition, she had been told by two surgeons that she needed to have her two lowest discs "fused" (Tr. 61). She acknowledged that one of the two surgeon's treating records stated that he recommended against surgery but that those records contradicted his verbal recommendation to her (Tr. 61). In contrast, she had been advised by her "pain" doctor not to undergo immediate surgery (Tr. 61). She experienced constant lower back and radiating pain of varying intensity (Tr. 61). The shooting pain was worse in her right leg (Tr. 62). She experienced severe pain three or four times a week at which time she took pain medication and reclined with her legs up and knees bent (Tr. 62). The pain was worsened by walking sitting, standing, bending, twisting, and lifting (Tr. 62).

Plaintiff's knee condition had worsened since the December, 2013 alleged onset of disability (Tr. 63). She experienced difficulty using stairs and was unable to squat or kneel (Tr. 64). She coped with the knee pain by sitting (Tr. 65). She had been told that a knee brace would not help her condition (Tr. 65). She had been prescribed insoles for the condition of plantar fasciitis but was unable to afford them (Tr. 65). The condition affected

-3-

her right foot (Tr. 65).

Plaintiff was unable to stand in one place (without leaning) for more than 10 minutes (Tr. 67).  She stated that her ability to walk varied from 30 minutes to the short time it took to go to the end of her driveway, adding that she was thus limited three to five times a week (Tr. 68).  She was limited to sitting for 30 minutes (Tr. 69).  She typically reclined once a day (Tr. 69).  She also experienced sleep disturbances due to leg pain and numbness (Tr. 69).

Plaintiff was able to read, write, and perform simple calculations (Tr. 70).  She was able to to cook and care for her personal needs but was not able to perform laundry chores, make the bed, or vacuum (Tr. 70).  She was unable to perform any outdoor chores (Tr. 70).  She typically drove no more than 10 miles at a time and required stops for position changes on longer trips (Tr. 70).  She was no longer able to perform her past activities of bowling, cutting, grass, or helping her family work on demolition derby cars (Tr. 71).  She was unable to work due primarily to the back condition and secondarily to the knee condition (Tr. 72).  She took pain medications two to three times a week (Tr. 72).  She experienced the medication side effect of sleepiness (Tr. 72).

## 2.  Plaintiff's Husband

Thomas Huff testified that since December, 2013 he was required to help Plaintiff out of her chair, carry laundry baskets, wash dishes, and clean (Tr. 73).  Plaintiff cried due to intense pain "a few times" a week in his presence (Tr. 73).  He stated that he believed that Plaintiff would "work if she could" (Tr. 74).

-4-

### B. Medical Records

#### 1. Records Related to Plaintiff's Treatment[1]

On December 10, 2013, Plaintiff reported a history of low back pain (Tr. 287). She exhibited "moderate" distress (Tr. 287). Zaza Godziashvili, M.D. wrote a four-day work release (Tr. 493). A December, 17, 2017 MRI of the lumbar spine showed a small disc herniation with stenosis with "mild abutment" of the S1 nerve root and "mild bulging" at L4-L5 (Tr. 313, 363, 498). December 18, 2013 records note that Plaintiff was employed, enjoyed crafting, and had four cats (Tr. 241).

January, 2014 physical therapy discharge records state that Plaintiff could sit for up to 75 minutes and was able to shop for several hours, vacuum, clean, and carry laundry without symptoms (Tr. 359). At the time of discharge, Plaintiff reported that she was pain free and was able to lift 35 pounds (Tr. 358). January 30, 2014 records note that Plaintiff resumed "light duty" work four days earlier (Tr. 279). She exhibited an antalgic gait but full strength in the left lower extremity and 4/5 strength on the right (Tr. 279). She was given an off-work note through February 28, 2014 (Tr. 507).

April, 2014 physical therapy records note a decrease in pain and that Plaintiff was able to stand to cook dinner, carry light loads of laundry, and "sit and drive" for approximately one hour without an increase in symptoms (Tr. 311). Plaintiff was given a month-long work release (Tr. 520).

---

[1]Treatment records for conditions unrelated to the arguments for remand are omitted from the present discussion.

April, 2014 treating records also note reports ongoing significant chronic back pain with radiating pain and numbness into the lower extremities (Tr. 305, 404, 410). An epidural injection was administered without complications (Tr. 345, 477). Plaintiff reported a 60 percent reduction in symptoms after the injections (Tr. 344). The same month, Plaintiff reported significant bilateral knee pain (Tr. 248). She noted that she had been off work since the previous December due to the back condition (Tr. 248). Kenneth W. Distler, M.D. did not recommend "a total knee arthrosplasty, but remarked that "some day [Plaintiff] will be a candidate for such" (Tr. 249, 252). June, 2014 records note good results from bilateral knee outpatient arthroscopic surgery (Tr. 244-247, 250, 253, 308). Plaintiff received synvisc injections to both knees (Tr. 245, 248). July and August, 2014 records note that following three epidural injections, Plaintiff no longer experienced lower extremity symptoms but had continuing back pain (Tr. 269, 412, 452). She exhibited full muscle strength (Tr. 453).

September, 2014 pain management records note Plaintiff's report of low back pain aggravated by walking, sitting, bending, driving, household chores, exercise, reaching overhead, squatting, twisting, change of weather, and rising from a seated potion (322). Plaintiff exhibited good posture, a normal gait, full strength in the lower extremities and no numbness (Tr. 325, 413, 419). Plaintiff was given a nine-week work release (Tr. 559). October, 2014 EMG studies were "mildly abnormal" with only "subtle changes" to the right lower extremity with no evidence supporting lower left extremity symptoms (Tr. 316). Plaintiff underwent a discogram showing a small disc herniation at L5-S1 without nerve root

encroachment (Tr. 330, 333). Imaging studies of the cervical spine were essentially negative (Tr. 334). November, 2014 records state that Plaintiff did "not want to consider anything surgical" for the back condition (Tr. 426). She again demonstrated full muscle strength (Tr. 468).

In February, 2015, Herbert Roth, M.D. noted Plaintiff's report of low back pain but observed a normal gait and full muscle strength (Tr. 435, 579, 581). Plaintiff reported that she took one Norco a day before retiring (Tr. 578). An MRI of the pelvis from the following month showed "mild" abnormalities at the sacrococcygeal junction consistent with a bone scan from the previous month (Tr. 581, 590). June, 2015 records by Judi Ecker, D.P.M. note right foot pain due to an injury and plantar fasciitis (Tr. 844). Plaintiff received an injection to the right heel (Tr. 844). The same month, Plaintiff was prescribed an orthotic device for the heel condition (Tr. 847). In October, 2015, Plaintiff sought emergency treatment for an asthma attack (Tr. 694). She reported that she smoked around a half-pack of cigarettes a day (Tr. 703). She was released in stable condition after receiving Benadryl and Ativan (Tr. 695). A November, 2015 MRI of the lumbar spine was similar to a previous study (Tr. 603, 662, 692, 736). The following month, Plaintiff reported continued lower back pain and coldness of the feet, worse on the right (Tr. 610). A neurological examination was wholly normal (Tr. 610). She exhibited full muscle strength (Tr. 610).

Plaintiff underwent a series of steroid injections between May and September, 2016 (Tr. 804-808). In June, 2016, Plaintiff reported renewed pain of the left knee (Tr. 850).

Plaintiff reported "tremendous[]" improvement in left knee pain after a second injection (Tr. 852).  A June, 2016 sleep study was consistent with sleep apnea (Tr. 793).  An x-ray of the right foot taken after Plaintiff dropped a pail of ice cream on it showed calcaneal spurs (Tr. 812, 823).

### 2.  Non-Treating Records

In February, 2015, Edward Brophy D.O. performed a non-examining evaluation of the treating and examining records on behalf of the SSA, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 93).  He limited Plaintiff to occasional postural activity (Tr. 94).  He found that Plaintiff would be required to avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights (Tr. 95).

### C.  Vocational Testimony

*The ALJ prefaced the vocational testimony by stating that Plaintiff's former work activity did not rise to the level of "past relevant work"* (Tr. 76).  ALJ McKee posed the following set of limitations to the VE describing a hypothetical individual of Plaintiff's age, education level, and work experience:

[A]ble to perform light exertionally work . . . .[2] This individual requires the

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;"  *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and

freedom to sit for five minutes after standing or walking for 30 minutes while remaining on task and at the work station.  This individual can occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  This individual can occasionally operate foot controls with her bilateral lower extremities.  This individual can occasionally balance on level surfaces and can never balance on moving or narrow surfaces.  This individual can occasionally stoop, kneelk, crouch, and crawl. This individual can occasionally tolerate exposure to atmospheric conditions . . . .  This individual can never tolerate workplace hazards such as unprotected heights and moving, mechanical parts.  This individual can perform simple, routine tasks.  Using the profile and the residual functional capacity as outlined in hypothetical number one, are there any other occupations the hypothetical individual could perform in the national economy? (Tr. 76-77).

The VE noted that the sit/stand option would allow for "only a few" exertionally light jobs, but testified that the above limitations would nonetheless allow for  the light, unskilled work of an electrical accessories assembler (42,000 positions in the national economy); hand bagger packager (134,000); and inspector hand packager (46,600) (Tr. 77-78).

The VE testified further that if the same individual were precluded from climbing ropes, ladders, or scaffolds, the job numbers would remain unchanged (Tr. 78).  He stated that if the same individual were also limited to sedentary work and was required to stand for five minutes after sitting for 30, she could perform the sedentary work of a call out operator (12,200); document preparer (39,200); and printed circuit board inspector (22,100) (Tr. 80).  He testified that the need to lie flat for 25 percent of the workday, take breaks lasting for 20

_____

that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

percent of the workday; or, miss two days of work each month would preclude all competitive employment (Tr. 81). The VE stated that his testimony was consistent with information found in the *Dictionary of Occupational Titles* ("DOT"), except for the testimony regarding a sit/stand option and being off task which was based on his professional experience (Tr. 79-81). He stated that the individual would be allowed to recline for five minutes in an eight-hour day in an area outside the work station (Tr. 82-83).

### D. The ALJ's Determination

Citing the medical transcript, ALJ McKee found that Plaintiff experienced the severe impairments of "lumbar degenerative disc disease, bilateral knee degenerative arthritis and chondromalacia patella, chronic obstructive pulmonary disease ("COPD"), asthma, obstructive sleep apnea, hypertension, and obesity" but that none of the conditions met or equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 32-33). The ALJ found that the conditions of plantar fasciitis, hypokalemia, hyperlipidemia, gastroesophageal reflux disease ("GERD") and dermatitis were non-severe (Tr. 32).

ALJ McKee determined that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following additional restrictions:

> [S]he requires the freedom to sit for five minutes after standing or walking for thirty minutes while remaining on task and at the workstation. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. The claimant can occasionally operate foot controls with her bilateral lower extremities She can occasionally balance on level surfaces. She can occasionally stoop, kneel, crouch and crawl. She can occasionally tolerate extreme cold and vibration. The claimant can tolerate occasional exposure to atmospheric conditions . . . . She can never tolerate workplace hazards such as

unprotected heights and moving mechanical parts.  She can perform simple, routine tasks (Tr. 34).

Citing the VE's testimony, the ALJ determined that Plaintiff could perform the light work of an assembler, packager, and inspector (Tr. 39, 77-78).

The ALJ discounted Plaintiff's alleged degree of limitation, citing physical therapy records showing that she was able to lift 35 pounds without pain, "shop for hours," and stand for up to 90 minutes (Tr. 37).  He cited Plaintiff's March, 2014 report that she could cook dinner, carry light laundry baskets, and drive long distances (Tr. 37).  He noted that Plaintiff experienced good results in 2014 and 2016 with knee injections (Tr. 37).  He noted that Plaintiff did not seek knee treatment between June, 2014 and June, 2016 and that in June, 2016, she reported dramatic improvement with the injections (Tr. 37).

The ALJ cited records noting a normal gait, full strength, and the absence of neurological symptoms (Tr. 37).  He noted that Plaintiff did not receive treatment for respiratory symptoms until 2015 and responded well to treatment (Tr. 38).  The ALJ accorded some weight to Thomas Huff's testimony that Plaintiff experienced significant pain but noted that the treating records did not support the conclusion that the conditions were work preclusive (Tr. 38).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation

altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).   The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  *Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g).   "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec*., 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs*., 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.  1986)(*en banc*).  Where  substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.   FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy."  *Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999).

## V.  ANALYSIS

### A.  The ALJ's Step Three Findings

In her first argument, Plaintiff takes issue with the ALJ's finding that she did not meet an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Plaintiff's Brief,* 15-18, *Docket #22,* Pg ID 938.  She contends, in effect, that she meets both Listing 1.02A (Major dysfunction of a joint(s)) and 1.04 (Disorders of the Spine).  *Id.* at 16-18.

-13-

In response, Defendant argues that Plaintiff cannot meet all of the criteria required for a finding of disability at Step Three. *Defendant's Brief,* 3-11, *Docket #23,* Pg ID 950. Defendant also cites the February, 2015 non-examining conclusion by Dr. Brophy that she was capable of exertionally light work. *Id.*

"Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Reynolds v. Commissioner of Social Sec.,* 424 Fed.Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011)(*citing* 20 C.F.R. § 404.1525(a)).   At Step Three of the administrative sequence, "[a] Claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled [] and entitled to benefits."  At Step Three, the claimant must satisfy *all* of listing's criteria for a finding that s/he meets a listed impairment. *See Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986); *Houston v. Colvin,* 2017 WL 82976, at *2 (E.D. Mich. January 10, 2017)(Drain, J.)(same).   Moreover, Plaintiff bears the burden of establishing that his or her impairments meet or medically equal a listed impairment. *Buress v. Sec'y of Health & Human Servs.,* 835 F.2d 139, 140 (6th Cir. 1987).

### 1.  Listing 1.02A

1.02 (Major Dysfunction of a Joint(s)), states in relevant part:

[G]ross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space

narrowing, bony destruction, or ankylosis of the affected joint(s). With: (A)
Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.02.  Listing 1.00B2b(1) gives examples

of "ineffective ambulation;"

[E]xtreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes
very seriously with the individual's ability to independently initiate, sustain,
or complete activities. Ineffective ambulation is defined generally as having
insufficient lower extremity functioning ... to permit independent ambulation
without the use of a hand-held assistive device(s) that limits the functioning
of both upper extremities.

Listing 1.00B2b(2) notes that "ineffective ambulation" is not limited to "the inability to walk

without the use of a walker, two crutches or two canes," but can include, for example, "the

inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use

standard public transportation, the inability to carry out routine ambulatory activities, such as

shopping and banking, and the inability to climb a few steps at a reasonable pace with the use

of a single hand rail." *Id.*

At Step Three of his analysis, the ALJ explicitly stated that Plaintiff did not meet or

equal Listing 1.02, noting that Plaintiff did not meet the threshold requirements for the Listing

or the requirement under subpart A of "ineffective ambulation" (Tr. 33).  As to the knee

condition, the ALJ noted that Plaintiff obtained good results from April and June, 2014

athroscopic knee surgeries and did not require additional knee treatment until June, 2016 (Tr.

36).  He cited the June, 2016 records noting that Plaintiff was administered Synvisc injections

which she reported "tremendously" improved the knee condition (Tr. 36).  As to the lumbar

spine condition, the ALJ observed that none of the multiple MRIs showed nerve root compression (Tr. 35-36).  He noted Plaintiff's report of 80 percent improvement in symptoms with steroid injections (Tr. 35).  He cited the treating records repeatedly noting a normal gait and full strength in all extremities (Tr. 35-37).   He cited Plaintiff's own report that as of March, 2014, she could stand to cook dinner, lift light laundry loads, and drive for an hour without an increase in symptoms (Tr. 37).  Finally, the ALJ observed that Plaintiff's treatment for the back condition was limited to injections, therapy, and medication (Tr. 37).  His citation to the record and conclusions are consistent with my own review of the record.

Accordingly, the ALJ's finding that Plaintiff did not meet Listing 1.02 should remain undisturbed.

## 2.  Listing 1.04

To meet Listing 1.04, the claimant must make a threshold showing of a spinal disorder such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture[ ], resulting in compromise of a nerve root (including the cauda equina) or the spinal cord."  20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04.  Plaintiff argues, in effect, that she satisfies the introductory requirements of osteoarthritis and degenerative disc disease  along with the A criteria, which require:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . .

§ 1.04A.[3]  As to Listing 1.04A, the ALJ noted that the evidence did not support the finding that Plaintiff met the threshold requirement of nerve root compromise or under the A criteria, nerve root compression or the neurological signs (Tr. 33).

Even assuming for the sake of argument that the MRIs of the lumbar spine showing a small herniation at L5-S1 meets the threshold requirements, substantial evidence nonetheless supports the finding that Plaintiff does not meet the A criteria of the Listing.  First, the ALJ noted that none of the multiple MRIs of the lumbar spine showed nerve root compression (Tr. 35-36).  He cited the treating records showing full strength in all extremities and negative straight-leg raising tests (Tr. 35-36).  He noted that nerve conduction studies were negative for neuropathy and radiculopathy (Tr. 35).  While Plaintiff alleges the neurological symptom of numbness and demonstrated a limited range of lumbar spine motion, the transcript does not contain evidence of motor loss, muscle weakness, or clinical signs of neurological weakness. Because the ALJ's finding that Plaintiff did not meet all of the requirements of Listing 1.04 is well supported and explained, a remand is not warranted.  *Lusk v. Commissioner of Social Sec.,* 106 Fed.Appx. 405, 411, 2004 WL 1791472, at *3 (6th Cir. August 6, 2004)(Non-disability determination upheld where substantial evidence supported the finding that claimant did not meet a listed impairment).

_____

[3]While Plaintiff also lists the B and C criteria under 1.04, there is no evidence to suggest that she experiences spinal arachnoiditis under the B criteria. Under the C criteria (as discussed above) she cannot show that she is unable to ambulate effectively as defined by Listing 1.00B2b.

**B.  Plaintiff's Subjective Complaints**

Plaintiff also disputes the finding that she was capable of exertionally light work, arguing that her allegations of limitation were improperly rejected.  *Plaintiff's Brief* at 18-21. However, based on largely the same evidence discussed above, Plaintiff's claim that her subjective complaints were not properly evaluated does not provide grounds for remand.

SSR 16–3p sets forth the standard for evaluating the alleged limitations using a two-step process.  2016 WL 1119029, at *3 (Mar. 16, 2016). First, the ALJ determines whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the alleged pain or limitation. *Id.*  Next, the ALJ evaluates the claims of limitation not reflected in the objective evidence. *Id.* at *3-4. The ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*  An ALJ's determination of the weight accorded to the subjective allegations is entitled to deference.  *See Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(An ALJ's assessment of claimant's allegations is entitled to "great weight")(*see also Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989))*(citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))(ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

The ALJ provided a thorough rationale for declining to accept Plaintiff's professed degree of limitation. As discussed above, he cited the treating records showing that Plaintiff exhibited full strength and a normal gait for the relevant period. He noted her report of good results from the epidural injections and her post-physical therapy report of the ability to stand for extended periods (Tr. 35-36). The ALJ cited December, 2013 physical therapy records showing that she could stand for up to 90 minutes and "shop for hours" (Tr. 37). He noted that Plaintiff required the use of pain medication only three times a week (Tr. 37). This is consistent with my own review of the record, *see* II.B. *above,* showing that Plaintiff was able to perform a wide range of daily activities following physical therapy; experienced good results from injections to the knees and spine; and demonstrated full muscle strength (Tr. 244-247, 250, 253, 311, 344, 358-359, 468). *See Cruse*, *supra,* 502 F.3d at 542–543 (ALJ entitled to consider household and other activities "in evaluating the claimant's assertion of pain or ailments"). For identical reasons, while Plaintiff argues that the hypothetical question to the VE (forming the basis of the RFC) did not reflect her professed degree of limitation, the ALJ did not err omitting the rejected claims. *See Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir. 1994)(ALJ not required to include discredited allegations or evidence in the question to the VE).

On a related note, Plaintiff faults the ALJ's accord of "significant weight" to Dr. Brophy's February, 2015 non-examining conclusion that she could perform a range of light work (Tr. 38, 93-94). She argues that Dr. Brophy did have benefit of the more recent medical

records showing the actual severity of her back and knee conditions and that because he was a non-examining source, his opinion was entitled to only limited weight. *Plaintiff's Brief* at 21, fn 6.

However, the ALJ's partial adoption of Dr. Brophy's findings does not present grounds for remand.  Plaintiff is correct that "[w]hen an ALJ relies on a non-examining source who 'did not have the opportunity to review' later submitted medical evidence, especially when that evidence 'reflects ongoing treatment,'" the courts "require 'some indication that the ALJ at least considered these new facts before giving greater weight to an opinion that is not based on a review of a complete case record.'" *Brooks v. Commissioner of Soc. Sec.,* 531 Fed.Appx. 636, 642 (6th Cir. August 6, 2013)(*citing Blakley v. Commissioner of Soc. Sec.,* 581 F.3d 399, 409 (6th Cir. 2009))(internal citations and punctuation omitted).  However here, the ALJ provided a page-long discussion of the medical records post-dating Dr. Brophy's findings (Tr. 35-36).  Therefore, it cannot be concluded that the ALJ did not consider the "new facts." Moreover, the records post-dating Dr. Brophy's February, 2015 review do not suggest that Plaintiff's subsequently condition deteriorated; she did not require additional knee treatment until June, 2016 and the imaging studies of the lumbar spine performed after February, 2015 show that the condition remained stable (Tr. 581, 603).

Plaintiff's claim that the ALJ erred by adopting a non-examining assessment likewise does not provide a basis for remand.  In some instances, "'opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating

or examining sources.'" *Brooks v. Commissioner of Social Sec.*, 531 Fed.Appx. 636, 642 (August 6, 2013)(citing SSR 96–6p, 1996 WL 374180, at *3 (1996)).  Notably in this case, none of Plaintiff's treating sources offered an assessment of her work-related abilities.   For this reason as well, the ALJ's accord of substantial weight to the non-examining source was not improper.

Aside from the fact that the ALJ was entitled to adopt the non-examining findings, he took care to state that he did not accept Dr. Brophy's findings altogether, noting that the treating records and Plaintiff's allegations supported additional limitations "in standing, walking, and climbing based on new evidence showing ongoing problems with her back and knees" (Tr. 38).  In consideration of Plaintiff's report that "her medication makes her tired" he limited her to "simple, routine tasks" (Tr. 38).

In closing, my recommendation to uphold the administrative findings should not be read to trivialize Plaintiff's legitimate physical limitations.  However, because the determination that she is not disabled is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen, supra*.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #23] be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED [Docket #22].

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE


Dated: September 16, 2019

-22-

**CERTIFICATE OF SERVICE**

I hereby certify on September 16, 2019, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on September 16, 2019.

s/Carolyn Ciesla
Case Manager to R. Steven Whalen
Executive U.S. Magistrate Judge

Dated: September 9, 2019